# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 2000-CA-01367-COA

**DOROTHY GRANT**                                                    **APPELLANT**

**v.**

**KMART CORPORATION D/B/A KMART SUPER CENTERS AND JAMES LENON, INDIVIDUALLY AND AS STORE MANAGER**          **APPELLEES**

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 07/18/2000 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL M. WILLIAMS |
| | THANDI WADE |
| ATTORNEYS FOR APPELLEES: | H. GRAY LAIRD III |
| | W. ERIC STRACENER JR |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| TRIAL COURT DISPOSITION: | MOTION TO DISMISS WITH PREJUDICE GRANTED |
| DISPOSITION: | AFFIRMED - 12/18/2001 |
| MOTION FOR REHEARING FILED: | 1/17/2002; denied 3/5/2002 |
| CERTIORARI FILED: | 3/19/2002; pet. for cert. stayed pending lifting of automatic stay of bankruptcy court 5/23/2002 |
| MANDATE ISSUED: | |

BEFORE SOUTHWICK, P.J., IRVING, AND MYERS, JJ.

SOUTHWICK, P.J., FOR THE COURT:

¶1. Dorothy Grant filed suit for injuries allegedly resulting from a fall at a Kmart Super Center store. The circuit court dismissed the suit with prejudice as a result of dishonest responses to discovery. Grant alleges that less severe sanctions would have sufficed, that there was no pattern of wilful misconduct, and that Kmart was not prejudiced. We disagree and affirm.

## STATEMENT OF FACTS

¶2. Dorothy Grant alleges that she was injured at a Kmart Super Center in June of 1996. She says that she slipped in a puddle of water that had formed on the floor. Suit was filed in 1997.

¶3. Grant objected to the following two interrogatories submitted by Kmart.

Interrogatory No. 12:

Have you ever suffered any injuries to your shoulders, back, knees, or hip in any accident either prior to or subsequent to the accident referred to in the complaint? If your answer is yes, give the date and place of the accident, a description of the injuries received, the names of all physicians or other persons who rendered medical treatment, names and addresses of any hospital where you were treated, the nature and extent of your recovery, and the nature and extent of your permanent disability.

Interrogatory No. 13:

Have you ever had any serious illness, sickness, disease or surgical operation to your shoulders, back, knees, or hip, either prior to or subsequent to the accident complained of in the complaint? If your answer is yes, then give the date and place, a detailed description of your symptoms, the names and addresses of any hospital rendering treatment, the approximate date of your recovery, and if you have not recovered the date your condition became stationary and a description of your condition at that time.

In July 1998, the circuit court granted Kmart's motion to compel responses to the interrogatories, overruling Grant's objection that these were beyond the scope of discovery. The court also ordered that Kmart be allowed to subpoena Grant's medical records from the medical providers listed in Grant's responses to these interrogatories.

¶4. In August 1998, Grant filed supplemental answers. To Interrogatory No. 12, Grant responded that "I suffered a mild shoulder strain to my right shoulder approximately 15 years ago playing with my dog. I was treated at the Mississippi Sports Medicine Clinic. I do not recall the name of the treating physician." To Interrogatory No. 13, Grant simply responded "no."

¶5. Also in August 1998, Kmart deposed Grant. The relevant portion of the examination of Grant by Kmart's counsel is this:

Counsel: Have you ever had any other falls either before this fall or after it?

Grant: No.

Counsel: You haven't slipped and fallen anywhere else?

Grant: I mean -- no, huh-uh, not to hurt myself. We all fall every day but not to hurt myself, huh-uh.

Counsel: You haven't had any other falls where you have had -

Grant: No.

Counsel: -- sought any type of medical treatment?

Grant: No.

¶6. Kmart and the trial court became aware two weeks before the scheduled trial that these answers did not reveal the complete story of Grant's injuries. On April 20, 2000, Grant's counsel sent to Kmart copies of exhibits that might be used at trial. Included was an incident report from another store, Sam's Club, which stated that on February 1, 1997, Grant fell after slipping on a patch of oil. That incident would have been eight months after the incident involved in the suit against Kmart. The report noted that Grant claimed

a sore hip and wrist as a result of the fall. Grant's counsel also attached a February 1997 medical report from Mississippi Baptist Medical Center stating that Grant had fallen and her chief complaint was lower back pain.

¶7. Kmart filed a motion to dismiss or in the alternative a motion for a continuance. The circuit court dismissed the suit with prejudice in an order dated July 18, 2000. The circuit court stated that Grant "gave false and untruthful material answers to Defendants' interrogatories numbers 12 and 13 (after being compelled by the Court to furnish complete answers) and also false and untruthful material answers to deposition questions relating to any injuries incurred after the subject accident" and that "information concerning an injury incurred following the accident was not disclosed to the Plaintiff's doctor, Carroll McLeod, M.D." The court further stated that "Defendants' attorney only learned of the subsequent injury and medical treatment relating thereto a short time before a scheduled trial of the case when the information was inadvertently furnished as enclosures from the Plaintiff's attorneys' office." The court concluded that dismissal with prejudice was appropriate in light of Grant's "repeated conduct" and would also "serve as a deterrent to others who might contemplate such actions."

## DISCUSSION

### 1. Abuse of Discretion

¶8. Grant argues that the circuit court abused its discretion by not considering sanctions less severe than that of dismissal with prejudice. The appropriate remedy from Grant's perspective would be to allow Kmart to re-depose both Grant and Dr. Caroll McLeod at Grant's expense. Dr. McLeod is a pain management specialist who first saw Grant on January 29, 1997, and then treated her on several later occasions after the alleged fall at Sam's Club on February 1, 1997.

¶9. Sanctions for discovery violations are within the discretion of the trial court. When a party "fails to obey an order to provide or permit discovery, . . . , the court in which the action is pending may make such orders in regard to the failure as are just." M.R.C.P. 37(b)(2). An order "dismissing the action or proceeding or any part thereof" may be appropriate. M.R.C.P. 37(b)(2)(C). Additionally, a "court may impose upon any party or counsel such sanctions as may be just . . . ." M.R.C.P. 37(e). The official comment states that this quoted subpart "gives greater flexibility to the trial court in the form of a general grant of power which would enable it to deal summarily with discovery abuses, whenever and however the abuse is brought to the attention of the court." M.R.C.P. 37(e) cmt. The comment also states that "courts should have considerable latitude in fashioning sanctions suitable for particular applications." *Id.*

¶10. In choosing an appropriate sanction, the trial judge's "orders will not be disturbed in the absence of abuse of discretion." *Kilpatrick v. Mississippi Baptist Med. Ctr.*, 461 So. 2d 765, 767 (Miss. 1984). The appellate court should affirm "unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Caracci v. International Paper Co.*, 699 So. 2d 546, 556 (Miss. 1997).

¶11. The Supreme Court has identified several factors to guide the exercise of discretion.

> First, dismissal is authorized only when the failure to comply with the court's order results from wilfulness or bad faith, and not from the inability to comply. Dismissal is proper only in situation[s] where the deterrent value of Rule 37 cannot be substantially achieved by the use of less drastic

sanctions. Another consideration is whether the other party's preparation for trial was substantially prejudiced. Finally, dismissal may be inappropriate when neglect is plainly attributable to an attorney rather than a blameless client, or when a party's simple negligence is grounded in confusion or sincere misunderstanding of the court's orders.

*Pierce v. Heritage Properties, Inc.*, 688 So. 2d 1385, 1389 (Miss. 1997), quoting *Batson v. Neal Spelce Assoc., Inc.,* 765 F.2d 511, 514 (5th Cir. 1985). We next examine each of these factors.

### a. Wilfulness or Bad Faith

¶12. The circuit court determined that Grant gave "false and untruthful material" responses in her interrogatory and deposition answers. These actions were labeled "intentional and deceitful."

¶13. When Kmart propounded its first set of interrogatories, Grant argued that the information sought by Interrogatories Nos. 12 and 13 was beyond the scope discovery. Grant claims as a result of the Kmart fall she injured her back. This necessitated, according to a June 24, 1997 letter from Grant's attorney to Kmart's insurance carrier, "lumbar injections for her extreme pain." It was later revealed that after the fall at Sam's Club, Grant admitted herself to Mississippi Baptist Medical Center complaining of lower back pain. The Sam's Club incident report also showed the Grant claimed a sore hip. The information sought by Interrogatories Nos. 12 and 13 was relevant as to the extent of Grant's back injury and to the apportionment of any damages between two different falls.

¶14. Grant was explicitly ordered by the court to provide a complete answer to the interrogatories. Grant failed to reveal the fall at Sam's Club subsequent to her fall at Kmart. For the trial court to conclude that such failure was intentional was no strained interpretation of the evidence. Grant claims in her brief that she "was not requested through written discovery to answer whether she had any other falls before or after the accident referred to in the complaint." Interrogatory No. 12 specifically requested whether Grant suffered any injuries to shoulders, back, knees, or hip in any accident either prior to or subsequent to the accident referred to in the complaint. The type of information sought by this question is easily understood. Grant argues that the answer was complete because the question did not specifically include the term "fall," and instead referred to "injuries" and "accidents." This is not a serious argument. Her attorney's ability to equate "accident" with "fall" appears in the complaint that was filed in this case, which stated this:

> she suddenly and without warning came into contact with water on the floor of said store which caused Plaintiff, Dorothy Grant, to fall to the floor with great force and violence, thereby sustaining serious bodily injuries. *Said accident* and injuries to Plaintiff, Dorothy Grant, resulting therefrom were solely caused by the negligence of the Defendant."

Grant also responded in an interrogatory that "I am not able to enjoy my normal activities as I did before my *accident*." Perhaps the fall at Kmart was an "accident," but the fall at Sam's Club was not. For the trial court to fail to see the distinction was not an abuse of discernment.

¶15. Interrogatory No. 13 supplemented the preceding one's inquiries about accidental injuries by asking about "illness, sickness, disease" and surgery. Grant excuses her one-word negative response by characterizing her injuries resulting from the Sam's Club fall as being "minor" or "non-acute." There is no evidence that Grant had some illness resulting from the Sam's Club incident. Though Grant had several treatments, apparently she had no surgery as a result of the fall. Therefore the clear problem in Grant's

answers relate to Interrogatory number 12, not to number 13.

¶16. A party has every right to make a good faith objection that certain interrogatories are improper. M.R.C.P. 33(b)(4); M.R.C.P. 11. After having made that claim but failed to convince the trial court, a party ordered to answer must do so fully and honestly. The trial court here was within its discretion in finding a deliberate violation of the order to compel as to Interrogatory 12.

¶17. Some but not all of the deposition responses are more ambiguous. What was clearly incorrect was Grant's answers that she had not slipped and fallen anywhere else, at least not of sufficient seriousness as to seek medical treatment. Her memory of a more recent fall than the one in issue in this litigation, a fall about eighteen months before the deposition, one for which she went to Mississippi Baptist Medical Center and filled out an incident report for the business where she fell, would not reasonably have been so dim.

¶18. Even if her memory was not totally keen on the day of the deposition, Grant was under "a duty seasonably to amend a prior response if [s]he obtains information upon the basis of which (A) [s]he knows that the response was incorrect when made . . . ." M.R.C.P. 26(f)(2)(A). The same can be said for the responses concerning subsequent falls. Grant stated that she did not have any subsequent falls in which she sought medical treatment. Grant did seek medical treatment for the fall at Sam's Club by admitting herself to Mississippi Baptist Medical Center on two separate occasions. The trial court did not have to believe that the initial answers and the failure subsequently to amend if an inadvertent mistake had been made were both honest oversights.

¶19. This case was set for trial on May 3, 2000. Discovery had been concluded in July 1999. The fact that Grant had fallen subsequent to the fall at Kmart was accidentally disclosed by Grant's counsel during the exchange of exhibits on April 20, 2000, approximately two weeks before trial. Obviously, this case almost was tried with the erroneous answers never corrected.

¶20. The trial court was within its discretion to find that many of these answers, central to understanding the nature and cause of the injuries for which Grant sought recovery, were intentionally false.

### b. Less Severe Sanctions

¶21. The trial court made a proper factual determination. The remedy for the violation is the next consideration. "Dismissal is proper only in situation where the deterrent value of Rule 37 cannot be substantially achieved by the use of less drastic sanctions." *Pierce*, 688 So. 2d at 1389. We have not found a requirement that the trial court muse aloud about the lesser sanctions on the record. However, under a different procedural rule that also permits involuntary dismissal as a sanction, the Supreme Court has held that "where there is no indication in the record that the lower court considered any alternative sanctions," the appellate court will consider that a reason not to uphold the dismissal. *American Tel. & Tel. Co. v. Days Inn of Winona*, 720 So. 2d 178, 181 (Miss. 1998) (applying M.R.C.P. 41(b), which permits dismissal for, among other things, the failure to comply with the procedural rules). Implicitly the court considered a lesser sanction since one was proposed below by Grant. That was "to allow the defendant to re-depose the plaintiff and Dr. Caroll McLeod at the expense of the plaintiff." The circuit court's disagreement is shown by the entry of the sanction of dismissal, based on a finding that the plaintiff had acted deceitfully, had done so repeatedly, and that the sanction was necessary "to serve as a deterrent to others who might contemplate such actions."

¶22. The plaintiff's silent obstinacy that Kmart would not learn of the subsequent fall permeated the answers given to discovery. Having the penalty be the payment of costs to correct the effect of that dishonesty is little deterrent to the practice. "[A]ny other sanction beside dismissal would virtually allow the plaintiff to get away with lying under oath without a meaningful penalty . . . ." *Pierce v. Heritage Prop.*, 688 So. 2d at 1391.

¶23. The trial court's rejection here of other sanctions was a reasonable exercise of discretion.

### c. Opposing Party Substantially Prejudiced in Preparation

¶24. Grant argues that Kmart was not substantially prejudiced because Grant and "her treating physicians were cross-examined about her medical care for all injuries that occurred before" the fall at Sam's Club. Grant also argues that the majority of her medical treatment was incurred before the fall at Sam's Club, and that her condition had already been diagnosed and that "it was not feasible nor warranted for Grant to tell her physicians" of the subsequent fall "because she had completed treatment with all of them with the exception of Dr. Carroll McLeod." Grant further argues in her reply brief that McLeod "diagnosed her condition prior to Sam's Club incident" and that Kmart was aware of Grant's treatment that followed her fall at Sam's Club because Grant tendered "medical records and bills" to Kmart's insurance carrier.

¶25. What Kmart could have proven is largely conjecture, a situation resulting from the last-minute discovery of the truth about the subsequent fall. Kmart never had the opportunity to explore with Grant's physicians how the subsequent fall at Sam's Club might have aggravated Grant's injuries. There is evidence that some of the physicians themselves were not told by Grant about the other fall.

¶26. Numerous problems allegedly resulted solely from the fall at Kmart:

> since the accident, I have suffered torn rotator cuffs resulting in severe pain in both shoulders; loss of muscle tone in both arms; pain in my lower back radiating down my left hip, knee and leg. When I am able to sleep, it is for brief periods due to pain and discomfort from the injuries. My life is affected in all areas including my job. My work requires that I visit patients in the city. While driving, the pain in my shoulders, back and legs is persistent and tiring.

Kmart should have been allowed to question Grant's physicians concerning what percentage of the diminution in the enjoyment of her life and also what percentage of Grant's pain and discomfort were attributable to each incident.

¶27. The results of Grant's failure to respond truthfully when ordered to do so arises from the list she provided of eight different medical providers from which she had received treatment for injuries caused by the fall at Kmart. In her sworn response, Grant stated that she received treatment at Mississippi Sports Medicine from July 16, 1996 to July 25, 1997; Mississippi Diagnostic Imaging Center from October 16, 1996 to August 1, 1997; Jackson Anesthesia Associates from January 29, 1997 to August 20, 1997; and Mississippi Surgical Center also from January 29, 1997 to August 20, 1997. The fall at Sam's Club occurred on February 1, 1997. Therefore, all these services that she received included the period that followed her fall at Sam's Club. Though she alleges that "it was not feasible nor warranted for Grant to tell her physicians" of the subsequent fall "because she had completed treatment with all of them with the exception of Dr. Carroll McLeod," that certainly is not true unless McLeod practiced in all four clinics for which post-February 1997 bills exist.

¶28. One precedent is strikingly similar. Mildred Scoggins was injured after being struck by a loaded dolly; she claimed injuries to her foot, leg, and back. *Scoggins v. Ellzey Beverages, Inc.*, 743 So. 2d 990, 991 (Miss. 1999). She failed to reveal in both her interrogatory responses and her deposition the prior treatments that she received in connection with her foot, leg, and back. *Id.* It was later revealed that Scoggins had been treated thirty-five times for complaints associated with her left leg, back/spine, and hip prior to her being struck by the dolly. *Id.* at 992. In dismissing Scoggins' suit, the trial court stated that "because Ms. Scoggins has undergone several procedures and additional therapy, including doctor visits, since the accident and subsequent filing of the suit, it is now likely to be an impossible task to separate the costs attributable to her prior condition from those attributable to the accident." *Id.* at 994. The Supreme Court affirmed. *Id.* at 997.

¶29. The last contention is that Kmart was aware of the fall at Sam's Club because her "medical records and bills" were submitted to Kmart's insurance carrier and because counsel for Kmart questioned Grant about the post-Sam's Club treatment. In a letter of June 24, 1997, sent to Kmart's insurance carrier, Grant's counsel stated that as "per your request, I have enclosed [a] copy of the Statement of the Injured along with the medical records and bills of Dorothy Grant." Counsel further stated that Grant suffered serious injuries as a result of her fall at the Kmart store. Included in the letter was an itemization of medical bills. Among those listed were bills that Grant now argues were for treatments after the later fall, which were from Mississippi Baptist Medical Center, the MEA and the Radiological Group. The letter concluded stating that "[a]fter you have had an opportunity to review the medical records and bills, please contact me so that we can discuss settlement."

¶30. Apparently these bills are related to the fall at Sam's Club and not at Kmart. Yet nothing in the bills themselves put Kmart on notice that they arose from an incident at a different time and place than the fall at its own store. Indeed, by seeking payment from Kmart, Grant was representing that Kmart was responsible for them.

¶31. The circuit court was correct in finding that Kmart was prejudiced in its preparation.

### d. Neglect Attributable to Client or Counsel

¶32. This case does not involve neglect, simple negligence, an inability to comply, or a sincere misunderstanding of the circuit court's orders. There is compelling evidence in the record that Grant's violations of both the rules of procedure and the order of the circuit court were deliberate, wilful, and done in bad faith. The record also supports that Grant must bear much of the blame. The submission of the medical bills relating to the fall at Sam's Club to Kmart's insurance carrier, the initial claim that the information sought was beyond the scope of discoverable material, and the failure to provide a full and complete answer after being ordered to do so evidence Grant's willingness to conceal the truth.

¶33. Even assuming that Grant's counsel did not initially know of the fall at Sam's Club, Grant's counsel should have known of the fall at some point during the litigation as it was counsel that provided the Sam's Club accident report during the pre-trial exchange of exhibits.

¶34. The circuit court had adequate evidence to conclude that Grant herself engaged in the conduct that was the basis for the sanction of dismissal.

### 2. Pattern of Wilful and Knowing Misconduct

¶35. In addition to the elements that we have reviewed that were enumerated by the Supreme Court in *Pierce*, Grant argues that we should reverse because there was no proof that she engaged in a pattern of wilful and knowing misconduct. She classifies the misconduct as an "isolated incident of failing to disclose a fall at Sam's Club whe[re] she received minor injuries primarily to body parts which are not related to her claim against Super Kmart."

¶36. We do not find that the issue of the potentially isolated nature of the conduct as being separate from the *Pierce* considerations, but instead as part of the evidence that weighs on the analysis of the other factors - was the conduct wilful, would a lesser sanction suffice, was the opposing party prejudiced, and was the client or the attorney responsible? Still, we will examine just how isolated this conduct might have been.

¶37. The trial court compared Grant's "false testimony and deceit" to that of parties in certain relevant precedents. The court found that her acts exceeded the seriousness of those in *Wood v. Biloxi Public School District*, 757 So. 2d 190 (Miss. 2000), and were "equal to or greater than the facts" in *Pierce* and *Scoggins*. What in capsule form Grant refused to reveal was the fact of an unrelated accident that led to two visits to the Mississippi Baptist Medical Center, the first to the emergency room, and the second as an out-patient. On both visits, Grant underwent X-rays.

¶38. Grant argues that the facts in this case are similar to those in *Wood* in which the Supreme Court held that the trial court abused its discretion in dismissing a suit based on one response to an interrogatory. The plaintiff Mark Wood responded to an interrogatory that injuries suffered when he was rear-ended by a Biloxi school bus affected his attitude, concentration, school work, "ability to do manual labor", and he was "no longer . . . able to enjoy tinkering with automobiles as the stooping, bending, and squatting are painful." *Wood,* 757 So. 2d at 192. After taking a video of Wood doing those things which he said he was no longer able to enjoy, the Biloxi School District moved to dismiss as Wood made "false statements under oath to deceive the defendants and the court." *Id.* at 192-193. The Supreme Court found that the interrogatory response was "ambiguously worded" and "subject to differing interpretations" and that "it was not clearly established that Wood knowingly made false statements." *Id.* at 194. The Supreme Court further stated that "the alleged untruthfulness in Wood's interrogatories, if any, does not constitute a sufficiently egregious discovery violation" to warrant dismissal. *Id.* at 195.

¶39. While some of Grant's responses to questions in deposition are arguably ambiguous, others are not. Moreover, there is nothing ambiguous about the response to Interrogatory 12. Grant either had a subsequent fall or she did not. By Grant's own admission, she fell at Sam's Club subsequent to the fall at Kmart. This case differs from *Wood* in one other important respect: Grant was under an order compelling a complete answer.

¶40. Grant also argues that her conduct did not sink to the level of that in either *Pierce* or *Scoggins*. In *Pierce*, the plaintiff, who had been struck in the head by a falling ceiling fan, failed to disclose to the defense that there was an eyewitness to the accident and maintained this secrecy during discovery and at trial over a period of five years. *Pierce,* 688 So. 2d at 1387. In *Scoggins*, the plaintiff, struck by a loaded dolly, failed to disclose approximately thirty-five visits to physicians for various medical treatments despite the fact she was requested to disclose previous injuries and medical history. *Scoggins*, 743 So. 2d at 991-92.

¶41. We see no beneficial distinction for Grant between her conduct and that shown in these precedents. Grant refused to answer in the face of a court order. "An implicit condition in any order to answer an interrogatory is that the answer be true, responsive and complete. A false answer is in some ways worse

than no answer; it misleads and confuses the party." *Pierce*, 688 So. 2d at 1389, quoting *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 107 (D. Md. 1989).

¶42. We find that dismissing Grant's suit with prejudice due to her "clear misconduct in this matter will . . . maintain the integrity of our adversary process . . . [;] to conclude otherwise would be to give this Court's seal of approval to a system which places technical accuracy above that which should be the common goal of all its participants-to learn 'the truth, the whole truth and nothing but the truth.'" *Pierce*, 688 So. 2d at 1391.

¶43. **THE ORDER OF THE CIRCUIT COURT OF HINDS COUNTY DISMISSING THE APPELLANT'S CAUSE OF ACTION WITH PREJUDICE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**McMILLIN, C.J., BRIDGES, LEE, MYERS AND BRANTLEY, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., THOMAS AND CHANDLER, JJ.**

IRVING, J., DISSENTING:

¶44. The majority concludes that the trial court did not abuse its discretion when it dismissed Dorothy Grant's complaint against KMart for injuries she received when she fell on KMart's premises. The trial court dismissed the complaint because it determined that Grant intentionally lied about not having suffered a fall or accident following her fall at KMart, thereby prejudicing KMart.

¶45. I respectfully dissent for several reasons. First, I believe the evidence is inconclusive as to whether Grant acted wilfully or in bad faith in not disclosing, in both her answers to interrogatories and in her deposition, the fact that she had suffered another fall. Secondly, I believe the deterrent value of Rule 37 of the Mississippi Rules of Civil Procedure can be achieved by a less drastic sanction; therefore, under case precedent, dismissal is not warranted, and the refusal of the trial judge to employ a less severe measure to remedy what he perceived as an intentional lie with prejudicial effect, constitutes an abuse of discretion. Thirdly, I believe the evidence casts suspicion on KMart's contention that the late revelation of the evidence caused it to be prejudiced. Quite the contrary, I believe the evidence raises a question as to whether KMart deliberately chose, for the purpose of gaining some later advantage, not to fully explore with Grant the information it had concerning the emergency room visit stemming from the latter accident. Having said this, I should clearly state I am fully aware that KMart's actions are not to be figured into the equation while assessing the appropriateness of the trial court's actions. Therefore, I comment upon KMart's actions only because I think they bear upon the degree of prejudice it claims to have suffered. Now with my premise fully set forth, I turn to the facts and the established law which guide me to my conclusion.

¶46. Grant filed her complaint against KMart on December 2, 1997. In her complaint, she alleged in paragraph VI that:

On or about June 16, 1996, Plaintiff, Dorothy Grant, was lawfully on the Defendant's premises as a consumer for the purpose of purchasing goods and while he [sic] walked through the store, she suddenly and without warning came into contact with water on the floor of said store which caused Plaintiff, Dorothy Grant, to fall to the floor with great force and violence, thereby sustaining serious bodily injuries. Said accident and injuries to Plaintiff, Dorothy Grant, resulting therefrom were solely

caused by the negligence of the Defendant.

¶47. In its answer to the complaint, in number five of its second defense, KMart said, "This Defendant denies the allegations of paragraph 6 of the complaint." By this response, KMart denied that Grant fell in its store and suffered injuries.

¶48. During discovery, KMart attempted to obtain, through interrogatories and Grant's deposition, information from Grant regarding any falls or accidents she had suffered prior and subsequently to the fall she had at KMart. The majority says that "the problem in Grant's answers relate to interrogatory number 12, not to number 13." Majority opinion at ¶15. I agree.

¶49. In interrogatory number 12, Grant was asked if she had "ever suffered any injuries to [her] shoulders, back, knees or hip in any accident either prior to or subsequent to the accident in the complaint." Grant, citing *Scott v. Flynt*, 704 So. 2d 998 (Miss. 1996), objected to answering this interrogatory on the basis that the requested information was beyond the scope of discovery and contrary to the holding in *Scott*. I have difficulty understanding counsel's reliance on *Scott* to support his position. Perhaps, he relied on the passage in *Scott* where the court stated, "It is understood that evidence does not have to be admissible to be discoverable, only relevant." *Id*. at 1004. Grant's counsel may have considered the requested information irrelevant since KMart had denied in its answer that Grant fell in its store. If KMart's only defense had been that the fall did not occur, counsel's position would have been a bit more understandable. However, when the totality of KMart's answers is considered, there is no doubt that KMart also alleged that Grant's injuries, if any, were caused by someone or some entity other than KMart. Therefore, the information was discoverable. In any event, once the trial court correctly ruled that Grant should provide the requested information, she was under an obligation to do so, notwithstanding her view on the appropriateness of the ruling.

¶50. While Grant's supplemental responses are not included in the record, all parties agree that, after she had been ordered by the trial judge to give complete responses to KMart's interrogatories, she gave the following limited answer to interrogatory number twelve: "I was treated at the Mississippi Sports Medicine Clinic. I do not recall the name of the treating physician." The record does not reflect who prepared the responses. It is not unreasonable, however, to assume that probably they were prepared by counsel since Grant was represented by counsel. Surely, if counsel prepared the answers, he simply may have been careless and not thoroughly familiar with the medical information in his client's file. Grant may have signed them without first carefully scrutinizing what she was signing. If such were the case, that would not erase the fact that this answer was true but incomplete. The trial court had ordered that Grant give complete responses. When Grant gave only this answer, she clearly disobeyed the trial court's order, but the question remains as to whether she acted wilfully or in bad faith. We cannot, however, know the intricacies of how the incomplete answer came to be given. The record does not lead us to the individual who caused the incomplete answer to be given. For sure, the law holds Grant responsible for curing the prejudice, if any, which flows from the incomplete answer. However, the law does not presume wilfulness or bad faith on Grant's part in the provision of the incomplete answer simply because it places the responsibility on her shoulders to cure the prejudice which flows from it. Bad faith must be proven by the facts, and in the absence of information shedding light on how the incomplete answer came to be given, there are no facts from which proof of bad faith may be determined.

¶51. On August 24, 1998, which was after Grant had provided the incomplete answer to interrogatory

number twelve, KMart took Grant's deposition. During the deposition, Grant was questioned by KMart's counsel about a bill from Mississippi Baptist Medical Center. This is the conversation that transpired:

Q. Have you ever been in any automobile accidents?

A. No.

Q. You haven't slipped and fallen anywhere else?

A. I mean -- no, huh-uh, not to hurt myself. We all fall every day but not to hurt myself, huh-uh.

Q. You haven't had any other falls where you've had --

A. No.

Q. -- sought any type of medical treatment?

A. No.

¶52. Some additional exchanges occurred between Grant and counsel for KMart. However, those are not relevant to the issue under discussion and are omitted. Following those exchanges, counsel returned to an exploration of the medical treatment that Grant had received. During this exchange, the following transpired:

Q. Then, also looking through your medical records, there was a Dr. John Meyer,[1] M-e-y-e-r, at MEA Clinics?

A. Huh? MEA Clinic?

Q. I think so. I may be mistaken. But do you remember seeing a Dr. Meyer?

A. (Witness shakes head.) *What for*?

Q. I'm not sure.

A. *Where is MEA Clinic*?[2]

Q. Well, there are several around town, kind of the after hours clinics.

A. Right.

Q. Have you been to any of those?

A. No.

(emphasis added).

¶53. Regarding the testimony set forth in the two exchanges above, at least two observations are noteworthy. First, during the initial exchange, Grant gave an emphatic "no" to the question as to whether she had any other falls requiring medical treatment. This answer was indeed false and was given by Grant before counsel could finish the question. The manner of Grant's quick response suggests she answered without seriously reflecting on the question being asked. Further, the emphatic "no" has to be considered in

light of what transpired in the last exchange since the last exchange was a continuation of counsel's effort to clear up the matter of what treatment Grant had received for the injuries she claimed in her fall at KMart. The second observation is that the last exchange depicts a person who has either totally forgotten about the February 3 visit to the emergency room or is deliberately attempting to evade discussing the treatment. Yet, neither analysis proves that Grant deliberately lied about not having had a subsequent fall requiring medical treatment or that she gave false testimony regarding a visit to a MEA clinic. In my judgment, when the two passages of testimony are evaluated in context, it is simply not tenable that the only conclusion to be drawn is that Grant intentionally lied about not having had any subsequent falls requiring medical treatment.

¶54. The trial court found that Grant's incomplete response to interrogatory number twelve, along with her deposition testimony, was a lie and constituted a wilful and intentional effort by Grant to avoid obeying the trial court's order. The majority says that this finding "was no strained interpretation of the evidence." Majority opinion at ¶14. I agree that the evidence could be interpreted as such, but, by the same token, I believe it would not be a strained interpretation of the evidence to also conclude that, while Grant's answer to interrogatory number twelve was incomplete and her deposition testimony was false, that answer and testimony do not prove conclusively that Grant intentionally lied and acted in bad faith in the provision of the answer and testimony.

¶55. Approximately eighteen months had expired between the time Grant fell at Sam's Club and the time she answered the interrogatories and gave the deposition. It is not inconceivable that Grant may not have immediately remembered the fall at Sam's club since she was apparently not seriously injured in that fall. If KMart's counsel had continued probing Grant about the February 3, 1997, emergency room visit, making it clear that it was a visit to the emergency room of Baptist Hospital and not to a MEA clinic, and Grant had given the same answer, the verdict would be clear, but that did not happen.[(3)]

¶56. The majority points out that it is not likely that Grant would remember the first fall, occurring approximately eight months earlier, and not remember the latter fall at Sam's Club. I do not find that fact astounding. It appears the majority is suggesting that it is implausible that one could better remember a more distant event than a recent one. In the criminal arena, we quite frequently accept and rely on testimony from persons who, at trial, remember facts that were not remembered or recalled at an earlier time closer to the event. If we are to reject the testimony of a witness who at one time, fails or is unable to recall facts of a more recent event but is able to recall facts regarding a more distant event, then we should reject, in criminal cases, the testimony of witnesses who fail to remember or recall facts immediately after the crime occurs but somehow regain memory of highly relevant facts during a more distant trial. Yet, we convict, imprison and sometimes put individuals to death on this kind of testimony.

¶57. In our case, it is not established that Grant knowingly made a false statement, and it is certainly not established that she was engaged in a pattern of submitting false responses. One incomplete and one false response can hardly constitute a "pattern of false responses." No, I cannot accept the suggestion that what happened here was an intentional and repeated effort on the part of Grant to avoid complying with the trial court's order, or to properly make discovery. The incomplete response was made only once, and the false answer was made only once.

¶58. This is not a *Pierce* discovery violation. *See Pierce v. Heritage Properties, Inc.*, 688 So. 2d 1385 (Miss. 1997). In *Pierce*, Stephanie Tyner Pierce was in bed with Read Bush at Northtown Apartments when a ceiling fan located above her bed fell on her from the place where it had been installed in the ceiling,

causing her personal injuries. She sued several defendants, including Heritage Properties, Inc. The first trial resulted in a substantial verdict for Pierce, but the verdict was set aside due to improper closing argument by Pierce's counsel. *Id*. at 1387. Other facts follow.

> During discovery . . . and at the first trial, Pierce maintained, under oath, that she was in the apartment alone when the accident occurred. *Sworn answers to interrogatories reveal that Pierce asserted that there was no other eyewitness to this accident, because no one was in the apartment with her. She reiterated this several times over a five-year period in various responses to interrogatories, in deposition testimony, and at trial*.

*Id*. (emphasis added). After the first trial concluded, the defendants discovered that Pierce was not alone in the apartment when the fan fell and thereafter, moved for a dismissal of Pierce's complaint against them. The trial judge granted the motion. On appeal, the Mississippi Supreme Court, in upholding the dismissal, held:

> The decision to impose sanctions for discovery abuse is vested in the trial court's discretion. The provisions for imposing sanctions are designed to give the court great latitude. The power to dismiss is inherent in any court of law or equity, being a means necessary to orderly expedition of justice and the court's control of its own docket. *Nevertheless, the trial court should dismiss a cause of action for failure to comply with discovery only under the most extreme circumstances*.

*Id*. at 1388. (citations omitted). (emphasis added). The facts in the case *sub judice* do not present an extreme case of flaunting the discovery process.

¶59. In deciding whether the dismissal was appropriate in *Pierce*, the supreme court discussed *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103 (D.Md. 1989), and quoted approvingly from *Smith* which held that "the focus must be on the intentional nature, as well as the pattern, of the plaintiff's conduct, which included deliberately providing false responses in three discovery mechanisms: the answers to interrogatories, the request for production of documents, and the deposition testimony." *Pierce*, 688 So. 2d at 1389.

¶60. In *Pierce*, the plaintiff informed the defendants of the identity of the witness to the accident only after she learned that the defendants had discovered that there was a witness to the accident. *Id*. at 1388. There is no evidence in our case which would remotely suggest that KMart had discovered the fall suffered by Grant at Sam's Club and that that fact was the motivating factor behind Grant's counsel sending the information to KMart's counsel approximately two weeks prior to trial. It seems highly illogical to me that Grant's counsel would send medical information to KMart's insurance carrier in June 1997 regarding Grant's fall at Sam's Club and again in April 2000 if the intent was to conceal information concerning the Sam's Club fall.

¶61. The trial court concluded, and the majority seems to agree, that the information sent in April 2000, regarding the Sam's Club fall, was inadvertently sent. The trial court did not express its view as to whether it believed that counsel intentionally or inadvertently sent the initial information in June 1996 concerning the Sam's Club fall. The majority, however, seems to suggest that counsel intended to send the information in June 1997 because he was engaging in a fraudulent scheme to get KMart to pay for something for which it had no liability. There is nothing in the record to support either the trial court's or the majority's conclusion in this regard. It is indeed a strained interpretation of the documentary evidence, unaccompanied by any testimony, to conclude that the information sent in June 1996 was sent intentionally but that the information sent in April 2000 was sent inadvertently. This strained interpretation, however, complements the faulty

premises undergirding the ultimate result reached in this case.

¶62. What is more logical is that counsel was not thoroughly familiar with Grant's medical information and records and that he sent the information in June 1997 and in April 2000 thinking that it all related to the KMart accident. It would not take a rocket scientist to detect, upon scrutinizing the information sent in June 1997, that something had happened to Grant since June 16, 1996 (the date of the KMart accident) that required emergency medical treatment. On the other hand, even a lay person much less an attorney, would recognize that if his intentions were to conceal the fact that the fall at Sam's Club had occurred, he was jeopardizing that plan by sending information in June 1997 regarding that fall. As stated, the majority seems to suggest that counsel's sending the information in June 1997 was an attempt to try and have KMart pay for something for which it bore no liability. Again, it would be a mighty foolish lawyer to try that, given the fact that he was sending information during the initiation of the scheme that, if properly examined, guaranteed that his fraudulent scheme would be uncovered. I cannot subscribe such a foolhardy and paradoxical act to counsel here.

¶63. In my judgment, there is a striking similarity between our case and the facts in *Wood v. Biloxi Pub. Sch. Dist.*, 757 So. 2d 190. In *Wood*, the trial court dismissed Mark D. Wood, Jr.'s negligence action against the Biloxi School District because, in the opinion of the trial court, Wood gave a false answer to one of the interrogatories propounded to him by the School District. *Id.* at 191(¶¶1-3). Wood had been injured on May 1, 1996, when a school bus rear-ended his vehicle. Wood filed suit against the School District on June 6, 1997. *Id*. at 192(¶4). The School District inquired as to the extent of the injuries suffered by Woods in the accident; Wood gave the following sworn response to the interrogatory:

> These injuries affected my attitude, my concentration, my school work, and my ability to do manual labor. I no longer am able to enjoy tinkering with automobiles as the stooping bending, and squatting are painful.

*Id*. at 192(¶6). Unbeknownst to Wood, in October 1997, the School District hired private investigators to conduct video surveillance on him. "Several hours of videotape, taken on different days, depicted Wood performing various manual tasks without apparent hindrance. The October 10, 1997, video, for example, depicts Wood bending, twisting, and squatting while performing manual tasks. A video taken in February, 1998 similarly depicts Wood performing manual tasks at the tire shop at which he worked." *Id*. at 192(¶5).

¶64. On appeal the Mississippi Supreme Court reversed the Rule 37(b)(2) dismissal of Woods lawsuit. In so doing, the supreme court said:

> The trial court's ruling is based upon a single alleged untruthful response in an interrogatory. Wood's response is ambiguously worded, thus subject to several reasonable interpretations. *Additionally, it is not established that Wood knowingly made a false statement and it is certainly not established that he submitted a pattern of false responses under the facts here*, and apply our precedent case law, other more appropriate sanctions should be considered by the lower court. Therefore, we reverse and remand.

*Id*. at 191(¶3). (emphasis added).

¶65. Having dealt with the wilfulness and bad faith issue, I will now discuss why I believe the record casts suspicion on KMart's claim that it was totally surprised to learn just before trial that Grant had suffered

another fall following her fall at KMart and that she had received medical treatment for the latter fall. Prior to initiating litigation, Grant attempted to settle the matter. As part of that effort, Grant's counsel, on June 24, 1997, sent to KMart's insurance company a copy of Grant's "medical records and bills." Included among those documents were medical records and a bill from Mississippi Baptist Medical Center for services rendered on February 3-5, 1997.[(4)] These medical records and bill were for services rendered in connection with the latter accident, that is, the accident occurring at Sam's Club on February 1, 1997.

¶66. A perusal of the medical documents sent to KMart's insurance carrier on June 24, 1997, leaves no doubt that those documents placed whoever read them on notice that Grant had made a limited emergency visit to Mississippi Baptist Medical Center on February 3, 1997. The documents show that the visit lasted an hour and a half. The documents show that Jon R. Meyer was the emergency room physician. This is a critical piece of evidence because, during her deposition, Grant was interrogated by KMart's counsel about having been seen by Dr. Meyer. Therefore, it is important in this analysis that we look back at the deposition colloquy between Grant and KMart's counsel. If KMart's counsel had the medical record in hand when questioning Grant - and apparently he did - it is difficult to understand why he refrained from questioning her about seeing Dr. Meyer, yet that is exactly what he did. It is perplexing why he would say, "I could be mistaken [about Grant seeing Dr. Meyer]" when the document clearly and unambiguously stated that it was for services rendered to Grant on February 3, 1997, by Dr. Meyer.

¶67. However, to be fair to counsel, maybe his statement represented nothing more than an attempt to be cordial. Nevertheless, even a compelling need to be cordial should not have prevented him from further exploring the question of whether Grant had received treatment from Dr. Meyer for something unrelated to the injury she suffered during the fall in KMart. This is especially true since Grant's counsel had sent this bill to KMart in June 1997, and represented that it was incurred as a result of injuries suffered in her fall in KMart. After all, a hospital emergency room visit can be occasioned by the occurrence of accidents as well as acute and unexpected sickness. In any event, the matter of Grant's hospitalization, whether due to accident or sickness, would be relevant to the issue of whether the injuries she was claiming occurred as a result of her fall at KMart.

¶68. What seems apparent to me is that KMart's counsel would view as highly suspect any contention that a bill for an emergency room visit occurring approximately eight months after the fall in KMart, would somehow be related to the KMart fall. I find it suspect that his curiosity was not heightened. If it was, it is not plausible that he would relent from questioning Grant when she appeared confused and evidenced a lack of knowledge regarding having received treatment from Dr. Meyer, unless he possessed an ulterior motive. It is entirely possible and plausible that KMart's counsel suddenly realized that he had caught Grant giving testimony inconsistent with the facts based on the information which had been forwarded to KMart's insurance carrier by Grant's counsel back in June 1997. If this were the case, any quick-thinking good trial lawyer, as no doubt KMart's lawyer is, would realize that Grant, by her testimony, had just placed in his hands something that he might be able to use to bring about her waterloo if he handled it gingerly. Of course, it would be good trial strategy to delay tipping his hand until such time as he could receive the maximum benefit.

¶69. I turn now to a discussion of the remedy. The majority, quoting *Pierce,* 688 So. 2d at 1389, correctly observes that "dismissal is proper only in situations where the deterrent value of Rule 37 cannot be achieved by the use of less drastic sanctions." Majority opinion at page 8. In cases involving dismissal for failure to prosecute, our supreme court has held that "[w]here there is no indication in the record that the lower court

considered any alternative sanctions to expedite the proceedings, appellate courts are less likely to uphold a Rule 41(b) dismissal." *American Tel. & Tel. Co. v. Days Inn*, 720 So. 2d 178, 181 (¶17)(Miss. 1998). There is nothing in this record to warrant the conclusion that the trial court considered a less drastic sanction, or if it did, why it concluded that the less drastic sanction would not serve the deterrent value of Rule 37.

¶70. The majority agrees that nothing in the record specifically shows that the trial court considered any less severe sanctions but concludes that the trial court must have done so because a less severe sanction was proposed by Grant. It is true that Grant proposed a less severe sanction, but it is also true that KMart proposed a less severe sanction. In the prayer of KMart's motion to dismiss, KMart made the following alternative request for relief:

> In the alternative, Defendant requests that the Court continue the trial of this case so Defendant may have an opportunity to fully discovery [sic] investigate and evaluate the Plaintiff's subsequent fall and medical treatment including redeposing the Plaintiff and her treating physicians at the Plaintiff's expense.

Grant made the exact same proposal. Since both parties were willing to accept a less severe sanction, the reason for the trial court's refusal to order the less severe sanction becomes all the more important. It would have been of great help to us, as the reviewing court, to be made aware by the trial court as to why a lesser sanction was not sufficient. Since the trial court offered none, I am compelled to conclude that it did not consider a less severe sanction. I am unwilling to accept the majority's view that the trial court implicitly considered and rejected a less severe sanction.

¶71. As stated, "dismissal is proper only in situations where the deterrent value of Rule 37 cannot be substantially achieved by the use of less drastic sanctions" even though dismissal is authorized. *Wood,* 757 So. 2d at 193 (¶9). In other words, a dismissal may not be proper even if the offending party's actions have created a situation where dismissal could occur. *Id.* "Lesser sanctions include 'fines, costs, or damages against plaintiff or his counsel, attorney disciplinary measures, conditional dismissal, dismissal without prejudice, and explicit warnings.'" *American Tel. & Tel. Co.*, 720 So. 2d at 181-82. I see no reason why the sanction offered by KMart in the alternative and accepted by Grant would not have been sufficient. Clearly, the only possible prejudice that KMart has suffered is its lack of opportunity to "fully discover investigate and evaluate the Plaintiff's subsequent fall and medical treatment." This prejudice can be cured by allowing KMart to redepose Grant's physicians at Grant's expense.

¶72. For the reasons presented, I respectfully dissent. I would reverse and remand this case to the trial court for imposition of a less severe sanction and trial on the merits of Grant's complaint.

### KING, P.J., THOMAS AND CHANDLER, JJ., JOIN THIS SEPARATE OPINION.

1. This is probably a spelling error. The physician's name is "Jon R. Meyer."

2. Apparently Grant was seen in the emergency room of Mississippi Baptist Medical Center. However, when Dr. Meyer, the emergency room physician, submitted his statement for the emergency services, he did so on letterhead bearing the "MEA" symbol. Perhaps this is why counsel mentioned only MEA.

3. The conduct of KMart's counsel on this point will be discussed in more detail in the paragraphs that

follow.

4. As will be discussed later in this opinion, it is not clear whether Grant actually received treatment on each of these days.